**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **DOVEY WHITE**, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )    Case No. 11 C 4560 |
| **UNITED CREDIT UNION**, | ) |
| | ) |
| Defendant. | ) |

## <u>MEMORANDUM OPINION AND ORDER</u>

Dovey White ("White") has sued her former employer United Credit Union ("Credit Union"), alleging that it violated the anti-retaliation provisions of the Family and Medical Leave Act ("FMLA," 29 U.S.C. §§ 2601 et seq.) and Fair Labor Standards Act ("FLSA," 29 U.S.C. §§ 201 et seq.[1]) when it fired her the day after the Department of Labor (the "DOL") found in her favor on an administrative complaint she had filed with the DOL. Now, almost four years and two plaintiff's lawyers later (White now represents herself), Credit Union has moved for summary judgment under Fed. R. Civ. P. ("Rule") 56 as to both the FMLA and FLSA theories. White has filed a response in opposition.[2] For the reasons set out in this opinion, Credit Union's motion for summary judgment is granted in part and denied in part.

---

[1] All further references to the FMLA and FLSA will take the form "Section --," using the United States Code's Title 29 numbering rather than those statutes' internal numbering.

[2] This opinion identifies Credit Union's and White's respective submissions as "C." and "W." followed by appropriate designations: the Credit Union's memorandum in support of the motion for summary judgment as "Mem. --" and its statement of facts as "St. --," and White's responses to those statements as "Resp. Mem. --" and "Resp. St. --." White timely delivered copies of her responses to chambers and to counsel for Credit Union, but apparently not to the Clerk of Court. Hence this Court's electronic case management system reflects as White's filing

(continued)

## **Factual Background**

What follows is an account of the relevant facts. Because what is at issue is a motion for summary judgment, factual disputes are resolved in favor of the non-movant (here White) and all reasonable inferences are drawn in her favor.[3]

Credit Union is a membership-based non-profit financial institution (C. St. ¶ 4). White worked for Credit Union from February 28, 1984 to August 28, 2008 (id. ¶ 3). During her tenure with Credit Union she filled a few different positions, starting as a switchboard receptionist and ending, at the time of firing, as a personal financial representative (id. ¶ 15). White's employment with Credit Union was subject to the terms of a collective bargaining agreement ("CBA") between Credit Union and the Professional, Technical and Clerical Employees Union, Local 707 ("Local 707"; CBA at 1, 3 and Section 1.1 (Dkt. 135 at 14-35)).

_____

(footnote continued)
date the much later date on which this Court itself docketed White's submissions after having realized that she had not done so herself.

[3] White, a non-lawyer now representing herself, complied only partially with LR 56.1. She offered no response at all to some of Credit Union's proposed facts and gave only incomplete responses to others. Typically such non-responses are treated as admissions for the purpose of summary judgment (see Apex Digital, Inc. v. Sears, Roebuck & Co., 735 F.3d 962, 965 (7th Cir. 2013)). But here White has failed to respond appropriately to at least some proposed "facts" that in reality are obviously and genuinely disputed (e.g., C. St. ¶ 49, which states that Credit Union told White the reason for her firing at the time she was fired, while White clearly asserts -- and has adduced evidence, as will be seen -- that Credit Union gave her a false reason for her firing). Because the fundamental purpose of the Rules is to "secure the just, speedy, and inexpensive determination of every action and proceeding" (Rule 1), and because justice would not be served by ignoring the facts in this (or any) case, this Court declines to impose admissions on White by reason of her partial non-compliance with LR 56.1.

Section 4.5[4] of the CBA set out the process that Credit Union would follow in disciplining employees. That section provided that Credit Union would follow a five-step progressive disciplinary policy for "infraction(s) of the employers policies and procedures" (CBA Section 4.5). Under the CBA's progressive discipline system an employee received an oral warning for her first infraction, a written reprimand for her second infraction within a year, another written reprimand and warning of suspension for her third infraction within a year, a suspension and warning of termination for her fourth infraction within a year and termination for her fifth infraction within a year (id.). In addition to that progressive approach to discipline, CBA Section 4.5 also gave Credit Union discretion to fire employees summarily when they used Credit Union funds without authorization and as a result of illegal or dishonest conduct:

> In addition, unauthorized use of Credit Union funds resulting from misappropriation of funds, theft, or criminal use of funds, fraud, falsification of computer records, embezzlement, violation of established rates on investment, savings, loans, and/or violation of personal security codes and any other financial institution fraud, pending investigation will be grounds for immediate dismissal.

To turn now to the events that led up to this lawsuit, White was absent from work on March 3 and 4, 2008 due to asserted illness (C. St. ¶ 8; W. Resp. Mem. § 1). Although she called in sick, Credit Union counted the absences as unexcused (C. St. ¶ 5; W. Resp. St. unmarked exhibit (Dkt. 135 at 36)). On March 24 White received a written warning stating that she had been absent from work without authorization on March 3 and 4 (C. St. Ex. 4[5]). That was

---

[4] In an apparent typo, two sections of the CBA are labeled "Section 4.5": one entitled "Discipline Procedures" and one entitled "Bulletin Boards." This opinion's references to Section 4.5 concern only the one entitled "Discipline Procedures."

[5] Credit Union has marked documents attached in support of its motion for summary judgment "Appendix Tabs." For brevity's and clarity's sake this opinion will refer to them by the more customary term "exhibits."

denominated her second infraction under the CBA (id.).  White responded on April 3 by submitting a doctor's note covering those absences, but Credit Union still treated the absences as unexcused and did not remove the written warning from her record (C. St. ¶ 8).  White filed a grievance with her union (id. ¶ 9) and then complained to the DOL on July 9.

Five days later, on July 14, Credit Union issued White another written warning, this time stating that White had improperly refinanced a loan of a Credit Union member who had filed for bankruptcy (C. St. Ex. 20).  That was denominated her fourth warning under the CBA's progressive disciplinary system, and Credit Union admonished White that her next infraction would be her fifth, which would warrant dismissal under the CBA (id.).

As for the infraction that Credit Union claims justified White's firing, it actually occurred earlier, in the first week of June 2008 (id. ¶¶ 17, 24).  At a Credit-Union-sponsored promotional event during that week White had approved a 4.25% interest rate on an auto loan, when she should have approved a 5% interest rate (id. ¶ 22).  Credit Union apparently learned of White's mistake in late June or early July (id.).[6]  But for reasons that Credit Union has chosen not to divulge, it did not initiate any sort of disciplinary proceeding against White until after she had complained to the DOL -- and indeed not until a federal investigation was ongoing or at least imminent.

_____

[6]  Although Credit Union is quick to point out that its audit <u>began</u> before White complained to the DOL, it either does not know or will not say when its "routine audit" zeroed in on the loans White had approved at the promotional event.  Credit Union also does not say whether that audit reviewed all loans in equal detail (C. St. ¶ 22).  On a motion for summary judgment this Court cannot infer from such silence that Credit Union's audit of White's loan approvals was simply a matter of routine and hence (as Credit Union urges) was unrelated to her FMLA charge.  To the contrary, the vague timeline that Credit Union has put forward makes it equally plausible to infer that Credit Union investigated White's loan approvals only <u>after</u> her July 9 complaint to the DOL -- and remember that Rule 56 principles call for reasonable inferences to be drawn in favor of nonmovant White.

Those disciplinary proceedings commenced when Credit Union's CEO Gary Peck ("Peck") met with White about the mistake on August 8, 2008 (id. ¶ 25). On August 13 White filed a charge of racial discrimination with the EEOC (id. ¶ 45). On August 15 Credit Union's labor relations committee met and decided "that the infraction warranted termination" (id. ¶ 26). Recall that it was her fifth infraction within a one-year timeframe, and the CBA called for dismissal in such a case. But for whatever reason, White was not dismissed yet.

On August 26, 2008 Maureen Katoll ("Katoll"), an officer with the DOL, held a proceeding with White and certain Credit Union employees present (id. ¶ 12). Katoll determined that Credit Union had indeed violated White's rights under the FMLA when it treated her absences on March 3 and 4, 2008 as unexcused, gave her a written warning and suspended her without pay (id.). On August 27 Katoll ordered Credit Union to repay White for the wages she was denied unjustly while suspended and further ordered Credit Union to remove the March absences from White's disciplinary file (Dkt. 135 at 55). Credit Union agreed to comply with Katoll's order without admitting liability (C. St. ¶ 12).

Credit Union fired White the next day, August 28, 2008 (id. ¶ 24). In the notice of dismissal it provided her, it stated that her error as to the interest rate would cost Credit Union $389.40 (C. St. Ex. 9). That notice omitted any reference to the progressive discipline policy under the CBA (id.). Instead it stated that White had violated "loan policies and procedures" and that CBA Section 4.5 allowed for immediate dismissal because of that violation.

After receiving that notice White filed another grievance with her union, which decided not to pursue the matter past the first step in the grievance process (C. St. ¶¶ 35-37). As for White's charge of racial discrimination, the EEOC decided not to pursue the matter and issued her a right-to-sue letter (id. ¶ 46).

White instituted this action on July 6, 2011, more than two years but less than three years after Credit Union fired her. She alleged retaliation in violation of the FMLA and FLSA, but she has since withdrawn her FLSA-based theory of relief (W. Resp. § 2.B).[7]

## Summary Judgment Standard

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to the nonmovant (here White) and draw all reasonable inferences in her favor (<u>Lesch v. Crown Cork & Seal Co.</u>, 282 F.3d 467, 471 (7th Cir.2002)). Courts "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts" in resolving motions for summary judgment (<u>Payne v. Pauley</u>, 337 F.3d 767, 770 (7th Cir.2003)). But a nonmovant must produce more than "a mere scintilla of evidence" to support the position that a genuine issue of material fact exists, and "must come forward with specific facts demonstrating that there is a genuine issue for trial" (<u>Wheeler v. Lawson</u>, 539 F.3d 629, 634 (7th Cir.2008)).

At the same time, even when a motion for summary judgment is not opposed or is ineffectively opposed, "the district court must still review the uncontroverted facts and make a finding that summary judgment is appropriate as a matter of law" (<u>Nabozny v. Podlesny</u>, 92 F.3d 446, 457 n.9 (7th Cir. 1996)). It is always the movant who bears the ultimate burden of persuasion on a motion for summary judgment (<u>Celotex</u>, 477 U.S. at 330-31 & n.2).

---

[7] Even had White not withdrawn that theory, she adduced no evidence that she ever engaged in activity protected by the FLSA. So Credit Union is entitled to summary judgment as to White's claims under the FLSA.

## Credit Union Not Entitled to Summary Judgment

Both Credit Union's motion for summary judgment and White's response provide something of an object lesson as to why the representation of both sides to a dispute by competent counsel is so important to our system of justice.  While White's response is both tediously exhaustive and largely off-point (a topic to which this opinion will return), nevertheless Credit Union has failed to put forward evidence that would show it to be entitled to summary judgment -- evidence that, if it exists at all, likely would have been developed in the first instance in response to well-crafted discovery requests from a competent plaintiff's attorney.  But before this opinion discusses those record facts that create an unmistakable dispute as to what caused Credit Union to fire White, it must address the threshold question of the timeliness of White's claim for relief.

**Statute of Limitations**

FMLA's Section 2617(c)(1) prescribes a two-year limitations period for actions brought under Section 2615, which includes FMLA's prohibition on retaliation.  Section 2617(c)(2) extends that limitations period to 3 years "[i]n the case of such action brought for a willful violation" of the statute.  In that respect our own Court of Appeals has not ruled on the meaning of "willful violation" for FMLA purposes, but most courts addressing the issue have ruled that the term has the same meaning under the FMLA as under the FLSA (see Bass v. Potter, 522 F.3d 1098, 1103 (10th Cir. 2008), noting the Tenth Circuit's agreement on that score with the First, Second, Sixth and Eighth Circuit Courts of Appeals).  And McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988) has definitively staked out the standard under the FLSA:

> The standard of willfulness that was adopted in [Trans World Airlines, Inc. v. Thurston, [,469 U.S. 111 (1985)] -- that the employer either knew or showed

reckless disregard for the matter of whether its conduct was prohibited by the statute -- is surely a fair reading of the plain language of the Act.

McLaughlin, id. at 135 thus instructs the courts to focus their inquiry on whether the employer acted recklessly in determining its obligations under the relevant statute.

White filed her complaint in this action some 2 years and 10 months after Credit Union fired her. That plainly puts her outside of the FMLA's ordinary default limitations period of 2 years. Hence her claim can survive only if she can show that Credit Union acted "willfully" in terminating her employment. Because whether or not a party acted willfully is a factual question for the jury to decide (Bankston v. State of Ill., 60 F.3d 1249, 1253 (7th Cir. 1995)), White need show only that a reasonable factfinder could conclude that Credit Union's actions were willful.

On that score the record evidence clearly suffices to create a factual dispute as to Credit Union's willfulness. White asserted at her deposition that Katoll specifically warned Credit Union, before or after the investigatory conference, not to retaliate against White (White Dep. 23:23-24:21).[8] Such a warning could certainly be understood as putting Credit Union on notice that White's activities up to that point were legally protected. Furthermore, a factfinder could also construe the very fact that Credit Union participated in a conference with the DOL as effective notice that White's underlying request for leave and her opposition to Credit Union's denial of it were protected as well. Frankly, under the particular facts of this case, it is hard to see how a factfinder could conclude that Credit Union retaliated against White intentionally because of her FMLA-protected activity without simultaneously concluding that Credit Union

_____

[8] While White's direct testimony on that topic would be inadmissible hearsay if offered at trial, the DOL's warning not to retaliate is capable of being submitted in an admissible form -- for example, White could call the DOL official who gave the warning to testify based upon her personal knowledge.

did so with reckless disregard for its obligations under the FMLA -- the two issues, while legally distinct, are in this case factually inseparable. That means only a factfinder will be able to resolve the willfulness question. Hence summary judgment on the question of willfulness must be denied.

**FMLA Retaliation**

To move on to the substantive issues, Credit Union asserts that White has failed to submit evidence sufficient to support a finding that it fired her in retaliation for engaging in activity protected by the FMLA. Instead, Credit Union says, the record indisputably shows that White was fired because she made a .75% error on a used car loan that resulted in a loss of a few hundred dollars to Credit Union. White counters that Credit Union's position simply is not believable in light of the record as a whole. This Court finds that the record evidence could support an ultimate finding in favor of either party, and therefore summary judgment is improper.

FMLA Section 2615(a)(2) provides:

> It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

And FMLA Section 2615(b) also forbids employer "[i]nterference with proceedings or inquiries" in this language:

> It shall be unlawful for any person to discharge or in any other manner discriminate against any individual because such individual --
>
> > **(1)** has filed any charge, or has instituted or caused to be instituted any proceeding, under or related to this subchapter;
> >
> > **(2)** has given, or is about to give, any information in connection with any inquiry or proceeding relating to any right provided under this subchapter; or

**(3)** has testified, or is about to testify, in any inquiry or proceeding relating to any right provided under this subchapter.

So to succeed on her claim of retaliation under the FMLA, White must show that "(1) she engaged in activity protected by the FMLA, (2) her employer took an adverse employment action against her, and (3) the two were causally connected" (Malin v. Hospira, Inc., 762 F.3d 552, 562 (7th Cir. 2014)). There is no dispute here that White engaged in activity protected by the FMLA: She opposed Credit Union's unwarranted refusal to credit her March 3 and 4 absences as FMLA-protected, she filed a charge with the DOL, she gave information to that Department in connection with its inquiry and she testified in a DOL proceeding.[9] There is also no dispute that Credit Union took adverse action against White when it fired her. That leaves the question of causation as the only area of dispute.

As to that question, there is some doubt whether a plaintiff must show but-for causation or "substantial factor" causation to succeed on a claim of FMLA retaliation (Malin, 762 F.3d at 562 n.3). Currently the controlling law in the Seventh Circuit is that a plaintiff need show only that an employer's retaliatory motive was a substantial or motivating contributing factor in the decision to fire (Goelzer v. Sheboygan County, Wis., 604 F.3d 987, 995 (7th Cir. 2010)). But in

_____

[9] White argues that Credit Union also retaliated against her because she helped Neely Guido ("Guido"), another Credit Union employee, when Guido needed to take leave under the FMLA. But Credit Union submitted evidence that it never knew of any help White gave to Guido (see Peck Decl. ¶ 10), and White failed to dispute that evidence (Guido's declaration, submitted by White, contains no statement that could fairly be read to support an inference that Credit Union knew White was helping Guido). Because an employer cannot retaliate against someone "because of" protected activity when the employer undisputedly has no knowledge of the protected activity, White cannot assert an FMLA retaliation claim based upon the assistance that she provided Guido.

this instance the question is purely academic -- as will be seen, White's claim survives summary judgment under either standard.

Apart from that, general principles of anti-discrimination law apply to claims that illegal retaliation was the cause of an employer's decision to take adverse action against an employee. Thus plaintiffs can survive summary judgment through either the direct method or indirect method of proof (Burnett v. LFW Inc., 472 F.3d 471, 481 (7th Cir. 2006)). White, proceeding pro se, understandably does not mark out how this or that fact meets the requirements of this or that method of proof -- but because the points that she raises go mostly to the direct method of proof, this opinion will view Credit Union's motion and White's response through that lens.

For that purpose Ridings v. Riverside Med. Ctr., 537 F.3d 755, 771 (7th Cir. 2008) (quotation marks and internal citations omitted) has set out the familiar standard:

> Under the direct method, a plaintiff must present evidence that her employer took a materially adverse action against her on account of her protected activity. A plaintiff can prevail under the direct method by showing an admission of discrimination or by constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker.

And of course, as that well-known image of a "convincing mosaic of circumstantial evidence" makes clear, more than simply "direct evidence" can be marshaled in support of the "direct method" (Atanus v. Perry, 520 F.3d 662, 671 (7th Cir. 2008)). As Cracco v. Vitran Express, Inc., 559 F.3d 625, 633 (7th Cir. 2009) (quotation marks and internal citations omitted) has explained:

> Under the direct method, proof of discrimination is not limited to near-admissions by the employer that its decisions were based on a proscribed criterion, but rather, includes circumstantial evidence which suggests discrimination albeit through a longer chain of inferences.

Applying the direct method to the record makes it plain that there is a real factual dispute as to whether a retaliatory motive caused Credit Union to fire White. There are essentially three facts (or sets of facts) that, taken together, would allow a factfinder to find in favor in White.

First is the highly suspicious timing of Credit Union's decision to initiate discipline against White and then to fire her. It is undisputed that it was only <u>after</u> White filed her FMLA charge that Credit Union started the disciplinary process against White -- purportedly because of a $389.40 loan approval error (Peck Decl. ¶ 14) -- despite having known about the error for as many as six weeks. Then, with the DOL's investigation still ongoing, Credit Union's labor relations committee met to discuss firing White (<u>id.</u> ¶ 16). Peck was authorized to fire White as of August 15, and a dismissal memo was ready as of August 19 (<u>id.</u>). But Peck did not actually fire White until (1) she participated in a DOL proceeding on August 26 and (2) Katoll found in her favor on August 27 -- at which point Peck fired White immediately, on August 28 (C. St. ¶¶ 12, 15). Apart from that highly suspicious chronology, it is doubly alarming that even in his own (presumably attorney-drafted) affidavit Peck could not give any convincing reason for the delay in firing White.[10]

While suspicious timing alone is not enough to defeat a motion for summary judgment (<u>Daugherty v. Wabash Ctr., Inc.</u>, 577 F.3d 747, 751-52 (7th Cir. 2009) (per curiam)), it certainly is the kind of circumstantial evidence that supports an inference of discrimination (<u>Pagel v. TIN Inc.</u>, 695 F.3d 622, 631 (7th Cir. 2012)). And the order of events here transcends the kind of garden-variety suspicious timing that fails to create a real dispute of fact. Credit Union took two steps in its disciplinary process -- its investigation of the loans that White had approved and its

_____

[10] This opinion will discuss Peck's affidavit in more detail later on.

ultimate dismissal of White on August 28, 2008 -- essentially contemporaneously with FMLA-protected actions that she took.  And the rest of Credit Union's decisionmaking process occurred while the DOL investigation was ongoing.  Taken together, that sequence surely supports an inference of retaliatory motive.

Second, there is more than just a suspicious chronology here -- a factfinder could reasonably conclude that Credit Union abandoned its usual disciplinary procedures when it fired White.  And when an employer abandons its normal policies and procedures to punish an employee, it tends to support the inference that the employer is acting out of a retaliatory motive (cf. Daugherty, 577 F.3d at 752).

Here the record strongly suggests that Credit Union violated the CBA when it fired White based on a loan approval error.  White plainly could not have been fired under the progressive discipline system set out in the CBA[11] -- and in any case Credit Union has not contended that she was fired under that system.  Instead Credit Union asserts that it fired White under the part of CBA Section 4.5 permitting immediate dismissal in circumstances involving dishonesty or illegal conduct.[12]  But the record evidence tends to show that Credit Union considered White's

_____

[11]  Counting White's loan error -- but not her absences of March 3 and 4, 2008, which were removed from her disciplinary file pursuant to a DOL order -- she had four infractions in the year leading up to August 28, 2008.  That made her eligible for suspension but not dismissal under CBA Section 4.5.

[12]  While Credit Union correctly points out that the list of acts warranting immediate dismissal includes the phrase "violation of established rates on investments, savings, loans," that phrase is in the middle of a laundry list of criminal and dishonest acts concluding with the catch-all "and any other financial institution fraud" (CBA Section 4.5).  Thus it reads most naturally as a reference only to illegal or fraudulent violations of established rates.  And Credit Union has submitted no evidence that Credit Union and Local 707 interpret the CBA to make any "violation of established rates" a fireable offense.  Hence the plain meaning of the CBA language must control.

loan approval error as a simple mistake and <u>not</u> an illegal or dishonest act.  Its dismissal memo,

for instance, makes no mention of dishonesty and instead accuses White of having approved a

loan in violation of "policies and procedures" -- the very same terminology that the CBA uses for

errors warranting correction through progressive discipline, not outright firing (C. St. Ex. 9).  In

sum, it is at a minimum reasonable to find that White was not fired in accord with the CBA,

which could in turn lead a trier of fact to conclude that Credit Union abandoned normal

procedures when it fired White.

But what is most damaging to Credit Union's motion is the third set of facts that could

support an ultimate finding in favor of White -- and those are the facts that tend to support an

inference that Credit Union is covering up its real reason for firing White when it did.  One

factual matter has to do with Credit Union's official justification for firing White, and another

has to do with Credit Union President Peck's explanation for the gap between White's dismissal

having been approved and the date of her actual firing.

As for Credit Union's claimed justification for firing White, it shifted somewhat, moving

from the simple violation of "loan policies and procedures" described in the contemporaneous

dismissal memo given to White to the more serious "violation of established rates" that Peck

later attested was the real reason for firing her (Peck Decl. ¶ 15).  Admittedly that is a small

inconsistency -- both justifications concern the loan approval error that she made.  But because,

as already shown, both justifications stretch the language of the CBA beyond its straightforward

meaning, a factfinder could reasonably conclude that the justifications are disingenuous.  And in

any case it is well established that an employer's shifting explanations for firing an employee can

support an inference of pretext (<u>Hitchcock v. Angel Corps, Inc.</u>, 718 F.3d 733, 738 (7th Cir.

2013)).

But that is not the only reason to question the truthfulness of Credit Union's asserted justification for firing White.  Credit Union submitted a declaration from Peck in which he attempted to explain why he fired White immediately after she participated in a DOL proceeding against Credit Union, despite his having known about her loan approval error for weeks and having had approval to fire her for at least 9 days.  Notably Peck did <u>not</u> attest that either he or the labor relations committee had definitively decided to fire White before to her participation in the DOL proceeding -- the only decision to which he refers was one that her loan approval error "warranted" dismissal (Peck Decl. ¶ 16).  That makes the timing of White's dismissal more significant than it might otherwise be -- a factfinding jury could read the record and reasonably conclude that Peck had final discretion to fire White, but he chose not to do so until she testified against Credit Union.

And what explanation does Peck give as to why he waited to fire White?  Simply that he was "not able" to fire her, despite there being several days on which both he and White were at work together <u>after</u> her firing was authorized (see Peck Decl. ¶¶ 17-19).[13]  And then, again in Peck's telling, it was only after White testified against Credit Union at the DOL proceeding that it somehow became -- through a process he does not disclose -- "possible" to fire White (<u>id.</u> ¶ 19).  Aside from a nonsensical assertion that Peck could not tell if White was at work on one day because she had missed work on a previous day (<u>id.</u> ¶ 17), that is all Peck offers by way of explanation.  And that non-explanation as to why Peck waited to fire White until immediately after the DOL  proceeding is so vague and so totally unsupported by credible explanation that a reasonable factfinder would be entitled to conclude that it is dishonest.

_____

[13]  Peck also says nothing about why, if White was somehow hard to pin down at work, he was "not able" to use phone or email to tell her to report to his (or someone else's) office.

And it is that above all that is fatal to Credit Union's motion. <u>Hobgood v. Ill. Gaming Bd.</u>, 731 F.3d 635, 646 (7th Cir. 2013) has stated the relevant principle:

> Where an employer's reason for a termination is without factual basis or is completely unreasonable, that is evidence that an employer might be lying about its true motivation.

And <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 511 (1993) (citation and internal quotation marks omitted, emphasis in original) made it clear over 20 years ago that an inference of dishonesty will be fatal to an employer's request for judgment as a matter of law:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination, and the Court of Appeals was correct when it noted that, upon such rejection, no additional proof of discrimination is <u>required</u>.

So the possibility (or even probability) that Peck was being dishonest about his reason for waiting to fire White clearly requires denial of summary judgment.

To summarize then, on this record a factfinder would be entitled to find intentional discrimination against White based on her protected actions: the timing of her firing was extremely suspicious, Credit Union appeared to depart from normal procedures to fire her, its official justification for her firing shifted slightly from one reason to another (and both reasons were dubious) and, most importantly, Credit Union President Peck certainly appears to have at least obfuscated -- and perhaps outright lied -- as to his real reason for firing White. To say the least, it is obvious that a grant of summary judgment would be entirely improper.

### Irrelevant Factual Matters Disputed by the Parties

So much for the substance of the Rule 56 motion. But to offer some clarity in going forward, this opinion will now take some moments to point up those factual matters from which

it is apparent that no reasonable inference having any bearing on this matter can be drawn. While in the ordinary course such an exercise would be unnecessary, here the parties have spent (really wasted) a considerable amount of time and energy disputing factual matters that really have no bearing on the subject matter of this action. And so some gentle but firm redirection is in order.

First among the irrelevant matters disputed by the parties are White's historical complaints[14] to the EEOC, NLRB, Illinois Department of Human Rights and her own union (C. St. ¶¶ 65-68; White Resp. St. ¶¶ 65-68). This Court fails to see how that history could possibly give rise to a reasonable inference that has anything to do with the present litigation. Those complaints allege racial discrimination, sexual harassment or unfair labor practices, and most of them were made years before White was absent for two days in March 2008, which set off the chain of events leading to this lawsuit. So no reasonable person could draw from them any conclusion having any bearing on whether Credit Union retaliated against White because of her FMLA-protected actions.

Next up, White's grievances that went to arbitration (and the arbitrators' decisions) similarly can give rise to no reasonable inference having any bearing on this litigation. They occurred in the 1990s and have nothing to do at all with White's exercise of her rights under the FMLA (W. Resp. § 2.C.1; W. Resp. St. Ex. 18-19).

_____

[14] That term refers to White's complaints that preceded the current controversy. She had also filed a charge with the EEOC in August 2008 (C. St. ¶ 45) and then complained to the NLRB after she was fired (id. ¶ 54). While the fact that White made those roughly contemporaneous administrative complaints may not be relevant evidence as such, the affidavits she gave in their support obviously might include relevant evidence -- and of course this Court does not intend to foreclose the parties from introducing such evidence as appropriate.

And the same must be said for White having been disciplined in 2006, purportedly for intimidating her fellow employees (C. St. ¶ 64; W. Resp. St. ¶ 64). That might show that Credit Union was dissatisfied with White's work in some global sense, or that White had a disagreeable personality, but it says nothing about whether Credit Union fired White in 2008 because of her FMLA-protected activities.

As for White's history of unexcused absences throughout her 24 years with Credit Union (C. St. ¶¶ 62-63), while that might say something about her sedulousness, it really has nothing at all to do with whether Credit Union retaliated against her for complaining to the DOL in the summer of 2008.[15] In a similar vein, Credit Union's choice to enact some kind of honesty policy in 2009 (C. St. ¶ 21; White Dep. at 232-33) might perhaps say something either good or bad about it as an institution in some abstract sense, but it cannot possibly give rise to any inference having anything at all to do with the facts of this case.

And lastly, the employment histories of the various Credit Union employees, which were discussed in White's deposition and Credit Union's statement of facts (as well as White's response to the same), are almost all irrelevant here, even under the liberal standard discussed in Coleman v. Donahoe, 667 F.3d 835, 846-47 (7th Cir. 2012). For some of those employees (particularly Ray Dina and Lori Jones) that is because Credit Union made disciplinary decisions about them some 20 years ago under a different set of supervisors (see C. St. ¶ 57(F) & (I);

_____

[15] Granted, White's long-term disciplinary history could have been offered as evidence that White was not meeting Credit Union's expectations and thus would have been fired even absent her FMLA-protected activity. But Credit Union has never urged that it abandoned progressive discipline in order to fire White for general incompetence or a long history of disciplinary issues -- perhaps because such a stance would amount to an admission that Credit Union had violated the CBA, which might in turn draw the ire of Local 707. Rather, Credit Union has consistently asserted that White was fired because she approved a used car loan at an interest rate 75 basis points below what its underwriting guidelines dictated.

W. Resp. St. ¶ 57(f) & (i); Peck Decl. ¶ 1). For others (such as Saul Pacheco, Jeff Golembuski and Joan McCormick or McClain), their alleged infractions were not subject to the part of CBA Section 4.5 that deals with illegal or dishonest conduct and were thus not subject to immediate firing, so the way that Credit Union treated their infractions can provide no useful comparison to Credit Union's treatment of White (C. St. ¶¶ 55, 57(B) & (E); White Dep. 156). For still other employees (particularly Linda Wiemeyer and Sylvia Bautista), White has so little personal knowledge about what occurred as to them or when it occurred -- and has been so unable or unwilling to produce other evidence regarding those matters -- that it would be impossible to draw any inference, positive or negative, from the few facts capable of being submitted in admissible form (C. St. ¶¶ 56, 57(A) & (C); W. Resp. St. ¶¶ 56, 57(a) & (c); White Dep. 140-42). And as to one employee's disciplinary history that might possibly be relevant here, that of Ed Mucha, White has adduced no evidence that Credit Union knew of Mucha's purported mishandling of mortgage loans until 3 or 4 years <u>after</u> White was fired -- and at that point Credit Union fired Mucha just as it had fired White (Peck Decl ¶ 9(H)).

This Court expects White and Credit Union to omit any reference to that congeries or matters for the remainder of this litigation, and to focus instead on the facts that are actually relevant to the central issue her. In case that either side has forgotten that central issue in the heat of the current battle, that issue is whether Credit Union fired White because she engaged in any of these FMLA-protected activities: (1) opposing Credit Union's denial of her request for FMLA coverage of her March 3 and 4 2008 absences, (2) filing a charge with the DOL, (3) cooperating with the DOL's investigation and (4) participating in the DOL proceeding that resulted in a finding adverse to Credit Union.

One final cautionary note is in order. White has done what few unrepresented litigants are able to do: She has shepherded her lawsuit past a motion for summary judgment without the assistance of counsel. But it must be said that White has dodged the summary judgment bullet <u>despite</u> her level of combativeness and her ignorance of the law, not <u>because</u> of them. And those unfortunate characteristics would be most likely be especially harmful to White should she proceed to trial without counsel.

To give just one reason why that is so, at trial -- unlike the situation during depositions or motions for summary judgment -- the Federal Rules of Evidence apply directly, and this Court will be bound to enforce them against White just as strictly as it would against a seasoned federal trial lawyer. And on that score the sheer number of irrelevant factual matters that White has stubbornly asserted throughout this litigation should make it totally clear to her that she lacks the knowledge and training necessary to try a case with anything even approaching competence -- or, frankly, with any hope of success.[16] If she really has the prospect of establishing a meritorious claim, it would be a shame for her to carry the matter this far only to lose everything because of her hard-headed refusal to retain counsel.

## <u>Conclusion</u>

For the foregoing reasons, Credit Union's motion for summary judgment is granted as to White's theory of relief grounded in the FLSA and is denied as to White's theory of relief

---

[16] In that respect White should also consider the possible impact on a jury of being confronted with a litigant who, based on her performance to date, is highly like to be met with a fusillade of objections from her opponent's counsel and with a consequently high likelihood of adverse judicial rulings. Of course there is the opposite possibility that jurors might react by being sorry for White (despite the universally given jury instruction that jurors should not react or vote on the basis of sympathy), but that would hardly seem to be a sensible gamble to take.

grounded in the FMLA.  All parties are ordered to appear for a status conference at 8:45 a.m. on

June 29, 2015.

_____
Milton I. Shadur
Senior United States District Judge

Date:  June 22, 2015